**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Harley-Davidson Credit Corp.

    v.                                    Civil No. 12-cv-374-LM
                                              Opinion No. 2014 DNH 185
Mark B. Galvin and
RASair, LLC


<u>**O R D E R**</u>

Harley-Davidson Credit Corporation ("Harley-Davidson") brought suit against RASair, LLC ("RASair") and Mark Galvin, alleging claims for breach of contract against both defendants. Default has been entered against RASair. <u>See</u> Document no. 14. Harley-Davidson moves for summary judgment on its breach of contract claim against Galvin. Galvin objects to the motion.


<u>Standard of Review</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue is one that can be resolved in favor of either party, and a material fact is one which has the potential of affecting the outcome of the case." Jakobiec v. Merrill Lynch Life Ins. Co., 711 F.3d 217, 223 (1st Cir. 2013) (internal quotation marks omitted). The movant may satisfy its

burden by showing "that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  In deciding a motion for summary judgment, the court draws all reasonable factual inferences in favor of the nonmovant.  Kenney v. Floyd, 700 F.3d 604, 608 (1st Cir. 2012).

<u>Background</u>

On April 24, 2008, RASair entered into a loan with Eaglemark Savings Bank ("Eaglemark") for $250,000, for the purpose of purchasing a Cessna 421C, bearing a manufacturer's serial number 421C0171, and a United States Registration mark N42ILW (the "Aircraft").  The loan was evidenced by an "Aircraft Secured Promissory Note" dated April 24, 2008 (the "Promissory Note").  As security for the loan, RASair granted to Eaglemark a first priority security interest in the Aircraft, including the Aircraft's airframe, engines, propellers, and record logs.  The security interest was evidenced by an "Aircraft Security Agreement," also dated April 24, 2008.  On the same day, Galvin executed an "Unconditional and Continuing Guaranty," in which he personally guaranteed RASair's performance under the Aircraft Security Agreement and the Promissory Note (the "Guaranty").

The court will refer to the Promissory Note, the Aircraft
Security Agreement, and the Guaranty collectively as the "Loan
Documents."

At some point, Eaglemark assigned the Promissory Note and
the Aircraft Security Agreement to Harley-Davidson.  On
approximately August 24, 2010, RASair defaulted on the
Promissory Note for failure to pay the amount due.

On September 6, 2011, after several months of discussions
with Galvin and in accordance with the terms of the Loan
Documents, Harley-Davidson repossessed the Aircraft.
Immediately upon repossession, the Aircraft was placed in the
custody of Specialty Aircraft Services, Incorporated ("SAS"), a
dealer that specializes in the sale of repossessed and
foreclosed aircraft.  SAS was tasked with selling the Aircraft,
and the proceeds of the sale were to be applied to RASair and
Galvin's outstanding debt related to the Aircraft.

While in SAS's custody, the Aircraft's audio panel was
vandalized.  Harley-Davidson had Specialty Aircraft Leasing,
Incorporated ("SAL") repair the audio panel and make several
other repairs to improve the condition of the Aircraft.[1]  SAL

---

[1] It is unclear whether SAS is affiliated with SAL.

provided an invoice for its repair services, which indicated that the cost for repairing the audio panel was $2,000.

SAS subsequently sold the Aircraft in November of 2011 for $155,000.  The proceeds of the sale, less expenses, were applied to the obligations owed under the Promissory Note to Harley-Davidson.  Harley-Davidson asserts that the remaining balance owed is $108,681.50, which includes the expenses incurred to repair the Aircraft, other than the cost for repairing the audio panel which was not included.[2]  On December 14, 2011, Harley-Davidson mailed to RASair and Galvin letters for "Demand of Repayment of Deficiency."  Neither RASair nor Galvin has paid any of the remaining balance.  This action followed.  Default has been entered against RASair.

## Discussion

Harley-Davidson moves for summary judgment on its breach of contract claim against Galvin.  It argues that it is

---

[2] The remaining balance was determined as follows in accordance with paragraph ten of the Aircraft Security Agreement: At the time of the sale, the total amount due to Harley-Davidson from RASair was $261,681.50, which included $243,162.98 owed under the Loan Documents, $7,750 for a Repossession/Broker Fee, $375 in Escrow Fees, and $12,393.52 in Aircraft Repairs, Storage, and Maintenance.  The Aircraft was sold for $155,000, which resulted in a remaining balance of $108,681.50.

uncontroverted that RASair defaulted on the loan and that Galvin is personally liable for the deficiency balance remaining after the Aircraft was sold.  Galvin does not dispute that RASair defaulted or that, under the Guaranty, he would be personally liable for any debt remaining had Harley-Davidson sold the Aircraft in the manner "specified by the contract."  Def.'s Obj. at 6.  He argues, however, that both the Loan Documents and the Uniform Commercial Code required that Harley-Davidson sell the Aircraft in a commercially reasonable manner, and there is a genuine issue of material fact as to whether Harley-Davidson did so.  He contends that, therefore, summary judgment is inappropriate.

The Loan Documents all contain choice of law provisions selecting Nevada law as the applicable law governing any disputes.  Both Harley-Davidson and Galvin agree that Nevada law applies.[3]

"Under Nevada law, breach of contract has three elements: (1) the existence of a valid contract; (2) a breach by the defendant; and (3) damage as a result of the breach."  U.S. Bank, NA v. Recovery Servs. Nw., Inc., No. 2:13-cv-1254-APG-GWF,

---

[3] Galvin does not specifically address the choice of law provisions in the Loan Documents but cites Nevada cases in his objection to the summary judgment motion.

2014 WL 1347376, at *2 (D. Nev. Apr. 4, 2014); see also

Takiguchi v. MRI Int'l, Inc., No. 2:13-cv-1183-JAD-VCF, 2013 WL

5150444, at *3 (D. Nev. Sept. 12, 2013).  As mentioned, Galvin

does not dispute that an agreement existed between himself and

Harley-Davidson.  Galvin admits that he guaranteed RASair's

obligations under the Loan Documents and concedes that as the

primary obligor, RASair subsequently defaulted on those

obligations to Harley-Davidson.  In addition, Galvin does not

dispute that he has failed to fulfill his obligation to pay

Harley-Davidson what RASair owes or that Harley-Davidson has not

received the total amount owed under the Loan Documents.

Instead, Galvin argues that he is not liable for the remaining

debt because Harley-Davidson did not sell the Aircraft in a

commercially reasonable manner.

Where there is "a challenge by the debtor to the commercial

reasonableness of [a] collateral's disposition . . . mere proof

of a valid contract and breach thereof is insufficient to

authorize entry of a deficiency judgment, i.e., the secured

creditor must prove that the sale was commercially reasonable."

Colonial Pac. Leasing Corp. v. N & N Partners, LLC, 981 F. Supp.

2d 1345, 1350 n.1 (N.D. Ga. 2013).  Although the initial burden

to show commercial reasonability is on the creditor, once the

creditor provides proof, the burden shifts to the debtor to present evidence of specific facts to show the existence of a genuine issue for trial. Id. at 1350; see also Keybank, N.A. v. Hartmann, No. 12-49-GFVT, 2014 WL 641003, at *5 (E.D. Ky. Feb. 18, 2014) ("When the commercial reasonableness of a sale is disputed, the party seeking affirmative relief, which is usually the secured party, has the burden of establishing that the disposition was conducted in accordance with" the Uniform Commercial Code (internal quotation marks and citations omitted)).

Under Nevada's version of the Uniform Commercial Code, the disposition of collateral must be commercially reasonable.[4]  See Nev. Rev. Stat. ("NRS") § 104.9610.  "'The conditions of a commercially reasonable sale should reflect a calculated effort to promote a sales price that is equitable to both the debtor and the secured creditor.'" F.D.I.C. v. Moore Pharm., Inc., No. 12-cv-67, 2013 WL

---

[4] The Aircraft Security Agreement also requires that if the Aircraft is sold, it must be sold in a commercially reasonable manner.  See Pl.'s Mot. for Sum. Judg., Ex. B. (document no. 37-6) at ¶ 9 ("**Remedies upon default.** Borrower agrees that, upon the Default of Borrower, the Secured Party may, at its election, and without notice and without demand . . . . (e) . . . sell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and such places as is commercially reasonable.").

1195636, at *3 (D. Nev. Mar. 22, 2013) (quoting Dennison v.
Allen Grp. Leasing Corp., 871 P.2d 288, 291 (Nev. 1994)).
The disposition of collateral is made in a commercially
reasonable manner if it is made "(a) In the usual manner on
any recognized market; (b) At the price current in any
recognized market at the time of disposition; or (c)
Otherwise in conformity with reasonable commercial
practices among dealers in the type of property that was
the subject of the disposition." NRS § 104.9627.[5]  Thus,
selling repossessed collateral through a dealer, if such
sale is "fairly conducted, is recognized as commercially
reasonable . . . ." Jones v. Bank of Nev., 91 Nev. 368,
373 (Nev. 1975) (quoting Comment 2 to former NRS §
104.9507); see also In re Clarkeies Market, L.L.C., No. 01-
10700-JMD, 2004 WL 768651, at *8 (Bankr. D.N.H. Apr. 8,
2004).

---

[5] Harley-Davidson states in its motion that at the time of
the sale, the relevant provisions of the U.C.C. governing the
disposition of collateral in a commercially reasonable manner
were codified at NRS §§ 104.9504(3) and 104.9507(2).  It appears
that although the current relevant provisions of the U.C.C., NRS
§§ 104.9610 and 104.9627, adopted the language of those
sections, they did so prior to the time of the sale.  Regardless
of the actual U.C.C. section that was in effect at the time of
the sale, the language of former NRS §§ 104.9504(3) and
104.9507(2) is identical to the current language of NRS §§
104.9610 and 104.9627.

Galvin argues that evidence in the record creates a genuine issue of material fact as to whether the Aircraft was sold in a commercially reasonable manner.  He contends that the vandalism to the Aircraft's audio panel, which occurred while the Aircraft was in SAS's possession, went unrepaired until after the Aircraft was sold, significantly diminishing its value.  He further argues that Harley-Davidson acted in bad faith by not reporting the vandalism to Galvin and by turning legitimate retail buyers away from the Aircraft and leading them toward other products in SAS's inventory.  Galvin contends that these actions led to a sales price of $155,000, which was significantly below the "Blue Book" estimated price for the same model of the Aircraft.

A.   <u>Vandalism to the Aircraft</u>

In support of his assertion that the vandalism to the Aircraft was not repaired until after the Aircraft was sold, Galvin points to the Aircraft Purchase Agreement ("Purchase Agreement").  The Purchase Agreement contains the following handwritten footnote at the end of Section 2: Condition of Aircraft:

> Additionally, Secured Party and Buyer acknowledge that
> the Aircraft is currently missing three electronic

> components that are to be returned and reinstalled.
> These components are a Garmin 530, Garmin 340 and
> Garmin 327.  Buyer and Secured Party acknowledge that
> buyer will need to have the opportunity to confirm the
> operational status of these components once
> reinstalled.  Secured Party agrees to reinstall these
> components no later than December 5, 2011.

Purch. Agmt. (doc. no. 39) at 11.  Galvin asserts that this

language in the Purchase Agreement shows that Harley-

Davidson did not repair the audio panel prior to sale as,

Galvin suggests, Harley-Davidson represented in its summary

judgment motion.  He also argues that repairs involving the

radios referenced in the footnote would cost well over

$10,000 even without installation, and that the absence of

those components at the time of the sale would have

negatively affected the price.

Even if Galvin were correct and the missing components

at the time of sale could have affected the sales price, he

has not properly supported that contention.  Instead,

Galvin simply points to his own affidavit, in which he

attests that based on his "experience in the aviation

industry . . . . lack of these avionics during showings and

test flights could cause a difference in the sale price, to

a retail buyer, equivalent to the difference between the

[sic] what the buyer paid in this instance ($155,000) and

the retail Blue Book value of over $269,000."   Galvin Aff.
(doc. no. 39-1) at ¶ 20.   Galvin's affidavit, however, does
not provide a factual basis for those assertions, and
Galvin does not point to any other record evidence to
support his statements.[6]

"Self-serving affidavits that do not 'contain adequate
specific factual information based on personal knowledge'
are insufficient to defeat a motion for summary judgment."
Spratt v. R.I. Dep't of Corr., 482 F.3d 33, 39 (1st Cir.
2007) (quoting Quiñones v. Houser Buick, 436 F.3d 284, 290
(1st Cir. 2006)); see also Perez De La Cruz v. Crowley
Towing and Transp. Co., 807 F.2d 1084, 1086-87 (1st Cir.
1986) (appellant's own affidavit, which asserted facts
based on his "past experience," was insufficient by itself
to defeat a properly supported motion for summary

---

[6] For example, Galvin did not cite any examples where
missing radio components at the time of purchase caused any
diminution in the sales price of a plane.   In addition, Galvin
states in his affidavit that the missing components "could"
cause a diminution in value of $100,000, and does not point to
any evidence showing that the missing components would cause
such a decrease in value or any decrease in value.

judgment).[7]  Therefore, Galvin cannot avoid summary judgment based on the issue of the missing components.


    B.   <u>Bad Faith</u>

    Galvin argues that Harley-Davidson acted in bad faith because SAS "deliberately obscured" the vandalism from Galvin, <u>see</u> Def.'s Obj. at 2, and because SAS dissuaded legitimate retail buyers from purchasing the Aircraft while pushing them toward other products in SAS's inventory.  He contends that Harley-Davidson's bad faith actions show that it did not act in a commercially reasonable manner in selling the Aircraft.

---

    [7] Galvin appears to suggest that because the price of the radio components was over $10,000, the fact that he was only credited $2,000 for the repairs demonstrates that Harley-Davidson did not act in a commercially reasonable manner.  To the extent Galvin intended to argue that the deficiency balance should be offset by more than the $2,000 listed in SAL's invoice, that argument is unavailing.  The evidence in the record shows that Harley-Davidson paid $2,000 for repairs to the audio panel, and nothing in the record implies that Harley-Davidson secretly made repairs to the audio panel and added the cost of those repairs to Galvin's deficiency balance. In addition, Galvin fails to explain how, even if he was not credited with the proper cost of repairs, that fact has any bearing on whether Harley-Davidson sold the Aircraft in a commercially reasonable manner, which is his only challenge to Harley-Davidson's summary judgment motion.

Galvin's arguments fail to demonstrate the existence of a disputed issue of material fact.[8]  Galvin provides no evidence to show that SAS purposefully hid the vandalism from him.  Even if SAS did hide the vandalism from Galvin, he does not show that this lack of knowledge made any difference.  Galvin learned of the vandalism on November 4, 2011, <u>see</u> Galvin Aff. (doc. no. 39-1) at ¶¶ 15-16, but the Aircraft was not sold until almost a month later, on November 30, 2011.  Galvin did nothing during that month to suggest that he objected to SAS selling the Aircraft.

In addition, Galvin provides no evidence that SAS pushed away legitimate buyers.  The evidence shows that Galvin emailed Bill O'Brien, a representative of SAS, on November 3, 2011, informing him of a potential buyer and asking for information on the Aircraft.  O'Brien responded on November 5, 2011, explaining

---

[8] Although Galvin argues that Harley-Davidson acted in bad faith, the actions of which he complains were taken by SAS, not Harley-Davidson.  While Galvin labels SAS as Harley-Davidson's "agent," nothing in the record supports that assertion, and the record evidence shows that Galvin communicated almost exclusively with SAS and not Harley-Davidson concerning issues relating to the sale of the Aircraft.  <u>See</u> Def.'s Obj., Ex. E (doc. no. 39-6); Pl.'s Reply, Ex. A (doc. no. 41-2). Nevertheless, to the extent SAS acted in bad faith, such actions could be relevant to whether the Aircraft was sold in a commercially reasonable manner and, therefore, the court addresses Galvin's arguments.

that "the plane is listed on the controller," that SAS is
"looking for bids on the aircraft," and asking Galvin to "[h]ave
you [sic] interested party call me."  Def.'s Obj., Ex. E (doc.
no. 39-6) at 3-4.  Galvin attests that he "dropped the potential
buyer" and did not have him contact O'Brien.  Galvin Aff. (doc.
no. 39-1) at ¶ 18.

Further, even if SAS was not actively marketing the
Aircraft on November 3, 2011, any lack of marketing is explained
by the record evidence.  O'Brien's November 5, 2011, email lists
several problems with the Aircraft, including that the
"autopilot is inop[erable]." Def.'s Obj., Ex. E (doc. no. 39-6)
at 4.  Galvin himself noted that there was an issue with the
autopilot in August of 2010.  Pl.'s Reply, Ex. A (doc. no. 41-2)
at 3.  Upon repossession in September of 2011, Mark Strassel,
the Director of Operations, Aircraft for Harley-Davidson, wrote
that the "plane ran well down to FL but their [sic] is an auto
pilot issue."  Pl.'s Mot. for Sum. Judg., Ex. F (doc. no. 37-10)
at 2.  In other words, even if SAS was not actively trying to
sell the Aircraft in early November of 2011, it appears that
there were legitimate reasons, including problems with the
Aircraft that were incurred while the Aircraft was in Galvin's
possession.

Galvin offers no evidence of bad faith, or any reason why SAS would have intentionally sold the Aircraft for less than its value.  See, e.g., In re Davis, 14 B.R. 226, 228 (Bankr. D. Me. 1981) ("It cannot be presumed that a reasonable seller would dispose of its collateral, in whatever marketplace, for less than the market would bear.").  Therefore, the record evidence does not support Galvin's assertion that Harley-Davidson, through SAS, acted in bad faith.

C.  <u>Value Received</u>

At its core, Galvin's argument is that SAS did not receive as much as it should have for the Aircraft, and that the only explanation for the low price is that the Aircraft was not sold in a commercially reasonable manner.  Galvin argues that the Bluebook value of the Aircraft at the time it was sold was approximately $269,000, and that he agreed to allow SAS to market and sell the Aircraft with the understanding that the proceeds from the sale would cover his debt entirely.

The price obtained at sale may be relevant when considering commercial reasonability, as "a wide discrepancy between the sale price and the value of the collateral compels close scrutiny into the commercial reasonableness of the sale." Ally

15

*Fin. Inc. v. Bosch Motors, Inc.*, No. 3:10-cv-677-RCJ-VPC, 2013 WL 1326479, at *6 (D. Nev. Mar. 29, 2013) (internal quotation marks and citation omitted).  However, "[t]he fact that a greater amount could have been obtained by a [disposition] at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the [disposition] was made in a commercially reasonable manner."  *Id.* (internal quotation marks and citation omitted).

Galvin asserts that he "had a reasonable expectation that the aircraft securing the Promissory Note had a fair market value which, when sold by Plaintiff, would have paid the Promissory Note in full."  Def.'s Obj. at 2.  Even if Galvin's expectation concerning the sale price were relevant, the record evidence shows that Galvin did not expect the Aircraft to sell for a significantly higher price than it did.  For example, on August 24, 2010, more than a year prior to the sale, Galvin asked O'Brien at what price he thought he might be able to sell the Aircraft.  O'Brien responded: "Depending on the actual paint and boot condition, we will advertise around 225-230 [thousand]. Expect 180-200 [thousand]."  Pl.'s Reply, Ex. A (doc. no. 41-2) at 3.  Therefore, Galvin was informed over a year prior to the

16

sale that SAS expected to sell the Aircraft, depending on the
condition, for $180,000 - $200,000, well below the amount Galvin
owed under the Loan Documents.  The record evidence demonstrates
that Galvin did not express any dissatisfaction with O'Brien's
quoted price, and indeed, Galvin subsequently consented to the
sale of the Aircraft through SAS, despite knowing of other
dealers who could sell the Aircraft.  See Galvin Aff. (doc. no.
39-1) at ¶ 9; see also Pl.'s Mot. for Sum. Judg., Ex. D (doc.
no. 37-8) at 2.

In addition, the price quoted in O'Brien's email was
dependent "on the actual paint and boot condition."  The record
evidence demonstrates that the Aircraft's paint and interior
were not in good condition due to Galvin's poor maintenance.
Upon repossession in September of 2011, Strassel wrote to
Galvin: "The paint and interior are in tough shape from sitting
outside unattended.  Billy is polishing the paint back the best
he can and he is going to do some work on the interior to make
it feel like someone was maintaining it."  Pl.'s Mot. for Sum.
Judg., Ex. F (doc. no. 37-10) at 2.  In other words, Galvin
asserts that the sales price of $155,000 demonstrates that the
Aircraft was not sold in a commercially reasonable manner,
despite (i) being quoted a price of $180,000 to $200,000

17

depending on the Aircraft's paint condition; (ii) the Aircraft being in poor paint condition; and (iii) the sale occurring more than a year after the quote, resulting in further depreciation. See, e.g., In re Nw. Airlines Corp., 393 B.R. 337, 340 (Bankr. S.D.N.Y. 2008) ("[A]n aircraft depreciates in value over time."). Thus, Galvin's assertion concerning his expectation that the sale price would pay off his debt in full is not supported by the evidence in the record.

Galvin also argues that the Aircraft had a Bluebook value at the time it was sold of $269,811.  In support, he points to a chart, presumably prepared by him, that purports to list the Bluebook value of the Aircraft and several accessories and avionics which he appears to contend were installed on the Aircraft.  See Def.'s Obj., Ex. B (document 39-3) at 2. Galvin's chart lists the average dealer price of the Aircraft as $220,000, and the average wholesale price of the Aircraft as $184,000.  Those figures are supported by the numbers in the Bluebook, the relevant page of which was included with Harley-Davidson's motion.  See Pl.'s Mot. for Sum. Judg., Ex. E (doc. no. 37-9).

The basis for the rest of the figures in the chart, however, is unclear.  Galvin does not provide copies of the

Bluebook pages from which he claims to have taken those figures. Even if he had, Galvin has not shown that the independent value of those accessories would have had any impact, let alone a significant impact, on the price of the Aircraft.  Moreover, Galvin's suggestion that the Bluebook price for the Aircraft in the fall of 2011 was approximately $269,000 is belied by O'Brien's email in August of 2010, in which he stated that, assuming that the Aircraft was in good condition, he would have advertised it at $225,000 - $230,000, but expected to get much less.

Galvin has raised no genuine issues of material fact concerning the commercial reasonableness of the disposition of the Aircraft.  The Aircraft was sold by an independent dealer to which Galvin consented.  The record evidence indicates that the Aircraft was sold to a third party in an arm's length transaction, and Galvin does not point to anything in the record to suggest that SAS sold the Aircraft in an unusual way. Although Galvin claims that the Aircraft was not sold in a commercially reasonable manner, there is an "absence of evidence" to support that argument.  Accordingly, Harley-Davidson is entitled to summary judgment on its contract claim against Galvin.

D.    Damages

Under the terms of the Loan Documents, Harley-Davidson is entitled to recover the deficiency balance.  As discussed above, the deficiency balance, calculated in accordance with paragraph ten of the Aircraft Security Agreement, is $108.681.50.

In addition, under paragraph five of the Promissory Note, Harley-Davidson is entitled to recover "all costs and expenses of [its] collection activity."  Pl.'s Mot. for Sum. Judg., Ex. A. (doc. no. 37-5) at ¶ 5.  Therefore, Harley-Davidson is entitled to attorneys' fees and costs incurred in this action.

An award of reasonable attorneys' fees is typically calculated by the lodestar method in which the court multiplies the hours productively spent by a reasonable hourly rate. Spooner v. EEN, Inc., 644 F.3d 62, 67-68 (1st Cir. 2011).  The party seeking a fee award bears the burden of producing materials to support the request.  Hutchison ex rel. Julien v. Patrick, 636 F.3d 1, 13 (1st Cir. 2011).  "Appropriate supporting documentation includes counsel's contemporaneous time and billing records and information establishing the usual and customary rates in the marketplace for comparably credentialed counsel."  Spooner, 644 F.3d at 68; see also Bogan v. City of Boston, 489 F.3d 417, 426 (1st Cir. 2007)).

20

Harley-Davidson requests an award of attorneys' fees of $70,100.50 and an award of costs of $550.  In support, Harley-Davidson provides the affidavit of its counsel, Daniel C. Fleming.  Fleming states in his affidavit that he is a partner with the firm of Wong Fleming PC, which represented Harley-Davidson throughout this matter.  Fleming lists the total number of hours worked by him and other attorneys at his firm on this case, as well as the hours worked by a paralegal at his firm, and local counsel.  He also provides his qualifications, as well as the qualifications for each Wong Fleming attorney who billed any time in this case.  However, he does not provide qualifications for local counsel.

He further sets out the billing rates for the attorneys and the paralegal, and states that "[t]he fees for the services provided by Wong Fleming are reasonable and consistent with the fees customarily charged in the locality for similar legal services."

"'Reasonable hourly rates will vary depending on the nature of the work, the locality in which it is performed, the qualifications of the lawyers, and other criteria.'" Hutchinson, 636 F.3d at 16 (quoting United States v. One Star Class Sloop Sailboat, 546 F.3d 26, 38 (1st Cir. 2008)).  In

addition, "[f]ee applications without contemporaneous business records should normally be disallowed." Entral Grp. Int'l, LLC v. Honey Café on 5th, Inc., No. 05 CV 2290 NHH MDG, 2006 WL 3694584, at *9 (E.D.N.Y. Dec. 14, 2006).

Harley-Davidson did not provide information about the hourly rate charged in the pertinent locality.  Nor did it provide any billing records for time spent on this case.  In addition, although Harley-Davidson contends that it is entitled to $70,100.50 in attorneys' fees, and although the breakdown of time in Fleming's affidavit totals that amount, Fleming states in his affidavit that the "attorneys' fees to date on this matter total $50,147.00."  Fleming Aff. at ¶ 15 (document 37-3). Therefore, Harley-Davidson has not met its burden.

## Conclusion

For the foregoing reasons, the plaintiff's motion for summary judgment (doc. no. 37) is granted to the extent it seeks damages in the amount of $108,681.50.  The motion is denied to the extent it seeks attorneys' fees and costs without prejudice to Harley-Davidson filing a properly supported motion for

attorneys' fees and costs.  Such a motion shall be filed within thirty days of the date of this order.

_____
Landya McCafferty
United States District Judge

September 4, 2014

cc:   Daniel C. Fleming, Esq.
      Kenneth D. Murphy, Esq.
      Mark W. Thompson, Esq.
      Micci J. Weiss, Esq.
      Mark B. Galvin, pro se

23